## Case No. 6,021.

HANEY et al. v. The LOUISIANA.

[Taney, 602.] [1]

Circuit Court, D. Maryland. Nov. Term, 1858.[2]

COLLISION — STEAMBOAT AND SAILING VESSEL — RULES GOVERNING EACH—MUTUAL FAULT.

1. If a steamboat approach so near a sailing vessel, without any fault on her part, as to cre-

---

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

[2] [Reversing Case No. 6,020. Decree of circuit court reversed in 23 How. (64 U. S.) 287.]

ate a reasonable apprehension that a change in the course is necessary to save the vessel or the lives of the crew, and an error of the moment, committed by the helmsman or look-out, bring on the disaster he meant to avoid, such error will not be regarded as a fault; the steamboat alone is responsible, and must answer the loss.

2. The rule, that when two vessels are meeting in opposite directions, each one shall port her helm, so as to pass each other on the larboard side, applies only to cases where both are sailing vessels, or both are steamboats, not to cases where one is a steamboat and the other navigated only by sails. In the latter case, it is the duty of the sailing vessel to keep steadily on her course, and the duty of the steamer to get out of her way, passing either on the starboard or larboard side, as may be most convenient to her.

[See Baker v. The City of New York, Case No. 765.]

3. A steamboat carrying the mail is bound by the same laws and rules of navigation that govern any other steamer which is engaged in the transportation of passengers or merchandise and without any mail; no contract with the post-office department, or any other department of the government, can dispense with any of the duties to which steamboats, navigating the same waters, are subject.

4. The strictest supervision should always be exercised by courts of justice over steam-vessels navigating our bays and rivers, and the utmost vigilance and caution constantly exacted from them, when approaching sailing vessels.

[See note at end of case.]

This case came before the circuit court on cross-appeals from the decree of the district court in favor of the libellants [Benjamin Haney, Charles Ogden, and John Trenchard, owners of the schooner Wm. K. Perin].

R. R. Buttee and Wm. M. Addison, for libellants.

Wm. Schley and Wm. K. Falls, for respondents.

TANEY, Circuit Justice. This is a libel by the owners of the schooner William K. Perin, of Fair Town, New Jersey, against the steamboat Louisiana [George W. Russell, captain], for running into and sinking her in the Chesapeake Bay, about five miles below the Rappahannock lightboat. The collision took place between nine and ten o'clock of the night of the 26th of February, 1858.

The schooner was engaged in the oyster trade; she was sixty feet long, eighteen feet beam, and registered at thirty-two tons; she was loaded with oysters, which she had obtained in the Patuxent river, and sailed from Drum Point harbor, at the mouth of the river, on the day above mentioned, down the bay, and bound for Philadelphia. The night was a bright moonlight one, on which vessels could be seen at a considerable distance. When the collision took place, the schooner was heading directly west, and she received the blow which sunk her, about ten or twenty feet from the stern (the witnesses give these different distances); the head of the Louisiana striking her at a right angle, on the larboard side. In determining whether either or both of these vessels were in fault, I proceed to examine, in the first place, the

manner in which the schooner was navigated.

The light of the steamboat was seen from the schooner, three or four miles off; there was no one on deck, from the time the light was seen, until after the collision, but Miles, the helmsman, and Carey, the look-out. The wind was about north-northwest, blowing a stiff breeze, and the schooner standing south, and going at the rate of six or seven miles an hour.

The look-out, Carey, states that he has been following the water, as an oysterman, for four and a half years, and during that time performing the duty of a mariner, when not dredging for oysters; that it was a part of his duty to help to navigate the vessel, to help to look out, and he was always in one of the watches; he had never been down the bay, below the Patuxent, until the night in question. He was walking on the leeward side of the vessel, when he saw the light of the Louisiana; he saw her, he says, between the night-head and foreshroud of the schooner, and of course, must have been walking abaft the foremast at the time. As soon as he saw the steamer, he called to the helmsman, and said, "Had you not better keep away?" and receiving no answer, he again called to him, about five minutes afterwards, and repeated what he had before said, but still received no answer. At the time he first saw the Louisiana, he says, she was to the leeward, and larboard, and eastward of the schooner, and distant three or four miles down the bay.

The statement of this witness shows that he was altogether unfit for the duty assigned to him. He was no seaman: he was on the leeward side of the vessel, abaft the foremast, where his view of the approaching vessel was necessarily more or less interrupted and confused than it would have been, if he had walked or stood at the head or on the starboard side, where there was no object between him and the approaching steamboat. It was a cold night, and it would seem that he was sheltering himself from the wind under the lee of the mainsail, instead of being at the appropriate place for a look-out. When he saw the light, he called to the helmsman to bear away; in other words, to stand more to the east, and received no answer; he contented himself with remaining where he was, and repeating the direction, without making the slightest effort to see the helmsman, or to ascertain why the direction had been disregarded; although a few steps would have brought him by his side. But the conclusive proof of his incompetency is, that at the time he gave these directions, he thought, he says, that the steamboat was to the eastward of the schooner; now, if the steamboat coming up the bay, was to the leeward and eastward of the vessel going down, his direction to bear away, if followed, would have placed the schooner directly in the path of the ascending boat, and

rendered a collision almost inevitable. Yet he states, positively, that he twice gave the direction, although he saw the steamboat rapidly approaching on that side. The apparent inconsistency of his conduct can be accounted for only by remembering that he was an oysterman rather than a sailor, and having never before been on that part of the Chesapeake Bay, he did not know, precisely, the points of the compass, and supposed the steamboat to be to the east of south, when she was really on the west; but, however this may be, the evident inconsistency of his directions, with the position of the steamboat, as he says he believed it to be, is sufficient proof, that he was not a competent look-out, and that there was gross negligence on the part of the schooner, in confiding such an important duty to a person so little qualified to perform it.

The helmsman was hardly better. It is difficult to understand, if he was awake, and attending to his duty, how it happened that he did not hear the advice of the look-out, twice given, to bear away. The vessel was a small one, and the look-out must have been only a few yards from him; but it seems, he sought no information from the look-out, and paid no attention to him, but took upon himself the double duty of look-out and helmsman; and the position in which he placed himself, for that purpose, made it impossible that either could be performed with proper nautical skill. He was on one knee, from a half to three-quarters of an hour, watching the Louisiana, under the boom of the schooner, and at the same time attending to his helm; the boom was only three and a half feet from the deck, and the compass about two feet ten inches; so that while he was in that position, looking at the steamboat, his attention was unavoidably withdrawn from the compass, by which it was his duty to steer, and that, too, when the vessels were nearing each other, and when steadiness and precision in his course were of the first importance; and when it was also his first duty, in order that the steamboat might see how she could avoid the schooner. It necessarily, also, for the time, diverted his attention from the helm, and with the stiff breeze blowing, and her sails on the larboard or eastern side, she would, upon any relaxation of his hold on the helm, luff, and her course be to the westward of south. Although he might correct this deviation, as soon as he again looked at the compass, yet he would inevitably fall into error, as to the relative position and course of the Louisiana, if, while he was looking at her, under the boom, he supposed his own vessel was standing due south, when, in fact, she might be a half point or point to the westward. His anxiety and apprehension would seem to have impaired his self-possession, as the steamboat neared him; he knew, he says, that it was his duty to keep his course steadily, and would not, therefore, have obeyed the directions of Carey, even if he had heard him. In

this respect, he was undoubtedly right; and it was, therefore, his duty to keep his eye steadily upon his compass, without looking out for the approaching vessel, or conjecturing what course it meant to take, or on which side it intended to pass him. It was the duty of the steamboat to keep out of his way; but he watched the steamboat, until his alarm got the better of his judgment, and instead of continuing on his course, he put his helm down, and brought the head of his vessel directly west, crossing, at right angles, the line in which the Louisiana was steering.

It is evident, therefore, upon the testimony given by themselves, that the schooner, at the time of the collision, was in the charge of two men, incompetent and unfit to be trusted with her navigation, on a great thoroughfare of commerce, where she was continually meeting sailing vessels and steamboats, moving in the opposite direction; and her mistakes and mismanagement contributed to the disaster, if, indeed, they were not the sole cause of it.

It remains to inquire into the conduct of the steamboat; for, if the Louisiana was in any degree in fault, she must share in the loss. The schooner was seen from the steamer, when she was three or four miles off; it was the master's watch, in which, according to established usage, the running and course of the vessel are in charge of the second mate, who is always in the master's watch; Ward, the second mate of the Louisiana, was in charge that night, and was also the pilot; and the Perin was observed, at the distance above mentioned, by the second mate, and by Captain Russell, who was then on deck.

The mate states, that, at the time he first saw the schooner, the steamer was heading due north, and the schooner appeared to be heading a south course, and then bore about north one-half east, on the starboard side of the Louisiana. The steamboat was going at the rate of twelve or fourteen miles an hour; she continued at the same rate of speed, and upon the same course; and when the vessels had approached each other within three or four hundred yards, the schooner then bore north one point east from the steamer, on the starboard side, and when she got within about one hundred and fifty yards, the helm of the steamer was put to starboard, and the vessel headed a north-by-west course, which left the schooner bearing two points east, on the starboard bow of the Louisiana. At the moment he had steadied her in that course, he discovered that the schooner, which had been standing to the south before, had altered her course, and had put her helm down, and was heading across the bay, as near as he could judge, a west course; this led her directly across the head of the steamboat, and she kept that course until the collision. The moment the mate saw the change in the schooner's course, he gave the signals to stop and back, which were instantly obeyed; the motion of the steamboat could not, however, be stopped, within the distance then between

the vessels, and the collision took place as hereinbefore described.

It has been said, there was not a sufficient look-out on board the steamboat, but I perceive no fault in that respect. Ward, the mate, who was the look-out at the time, is proved to be an experienced seaman, entirely trustworthy, and who had for years been employed in the navigation of steamboats up and down the bay, and on the Louisiana for four years. He was stationed in the pilot-house, which is proved to be the best position, for a look-out, on the steamboat; he watched the approach of the schooner, from the time she was first seen, until the collision, and promptly gave his orders to the helmsman and the engineer, as occasion required; nor did his duty as pilot, or his attention to the compass, interfere with his duty as a look-out; for the vessel was in a wide, deep water, where his duty as pilot and as a look-out was the same, that is, to conduct the vessel safely past other vessels, which she might meet with in her way; and he had, by his side, a helmsman, skilled and trustworthy, with the compass before him, who promptly obeyed the orders of the mate—he was a colored man, and cannot, therefore, be examined as a witness. But the mate would see, from the heading of his vessel, without looking at the compass, or taking his eye from the approaching schooner, whether the order he gave was attended to, and he testifies that it was immediately obeyed. And in my judgment it is evident, from the courses and position of the two vessels, from the time they came in sight of each other, that they would have passed each other in safety, if the schooner had continued, as it was her duty to have done, to hold her course due south.

So far as the witnesses on the two vessels differ, as to their relative position when first seen, and as they approached one another, the weight of the testimony is decidedly on the side of those on board the Louisiana; for there was a steersman and a look-out, each competent and experienced, and accustomed to navigate the bay for years before, each in his proper place, and each confining his attention exclusively to his appropriate duty; while the look-out on the schooner, when he formed his opinion of the relative bearing of the vessels, had no compass before him, was a stranger in the waters in which he was sailing, and could not be expected to form an accurate judgment of the points of the compass, of which he speaks; and what I have before said as to the position and conduct of the helmsman, shows that but little confidence can be placed in his opinion. Both of these witnesses say, that if the schooner had not changed her course, she would still have been struck by the steamer; but upon the whole testimony in the case, I think they are evidently mistaken. The schooner was going at the rate of six or seven miles an hour, when her helm was put down; she was not stationary while her course was

changing to the west, and her speed continued nearly the same; and she must have gone at least twice or three times her own length to the west, before she received the blow. The speed of the schooner was about one-half of that of the steamboat, when both vessels were under full headway; and after the schooner changed her course, with all her sails still set, she must have gone at least that distance west, before the steamer, backed as she was, could have passed over the one hundred and fifty yards which separated them, when the Perin put down her helm, and changed her course; and if that was the case, it shows that if she had kept steadily on, due south, she would have passed, at the distance of forty or fifty yards, on the eastern or starboard side of the Louisiana. Indeed, after the schooner headed to the west, being still under full sail, her speed must have been nearly equal to that of the steamer, when checked and retarded by the efforts to back her; and if the vessels were meeting in a direct line, when the helm was put down, as the witnesses for the libellants suppose, she must have cleared the line of the steamer some distance, and been safe on the west side; but it appears that ten or twenty feet of the schooner was still on the east side of the steamer, when the vessels came in contact.

Moreover, from the relative bearing and course of the vessels, as described by the master and mate of the steamer, when they discovered each other at the distance of three or four miles, they would have passed still further from each other, if the Perin had steadily kept her course south, as the steamer did her course north. But the unfavorable position in which the helmsman placed himself, and his anxious watching of the steamer for half or three-quarters of an hour, necessarily diverted his attention frequently from the compass, and from the strength of the wind; with the sails on the eastward side, there was a constant tendency to luff, and bring her head to the west of south, unless steadily restrained by the rudder, and in fact, without any obvious and palpable change in her general course, she was found nearer the steamboat than a due north and south line would have brought them, from their relative position, and bearing and distance, when they first came in sight of one another.

It has been urged on the part of the libellants, that this case falls within the rule laid down by the supreme court, in the case of The Genesee Chief, 12 How. [53 U. S.] 443. And undoubtedly, if a steamboat approaches so near a sailing vessel, without any fault on her part, as to create a reasonable apprehension that a change in her course is necessary to save the vessel, or the lives of the crew, and an error of the moment, committed by the helmsman or look-out, brings on the disaster he meant to avoid, the error will not be regarded as a fault, and the steam-

boat alone is responsible and must answer for the loss. It is a rule founded in justice, and ought to be rigidly enforced by the courts, but it does not bear upon the present case; for the contiguity of the vessels, and the collision, appear to have been occasioned altogether by the incompetency and mismanagement of the look-out and steersman of the schooner.

Nor does the rule that when two vessels are meeting in opposite directions, each one shall port the helm, so as to pass each other on the larboard side. The rule applies only to cases where both are sailing vessels, or both are steamboats, not to cases where one is a steamboat and the other navigated only by sails; in the latter case, it is the duty of the sailing vessel to keep steadily on her course, and the duty of the steamer to get out of her way, passing on either the starboard or larboard side, as may be most convenient to the latter. The rule upon this subject was stated by the supreme court, in the case of St. John v. Paine, 10 How. [51 U. S.] 583, where the whole subject was fully considered, and carefully decided; and the rules and laws of navigation there stated, have always since been adhered to.

In disposing of this case, I have spoken only of the testimony of the mate, and of the two witnesses who were on board the schooner. It is proper, however, to add, that I consider Captain Russell a competent witness, he having been first released by the owners; and his testimony strongly confirms that of the mate. He saw and observed the course of the schooner when she was descried, and the course she was steering, and also the course of his own boat, and their relative bearings, and he had been in the cabin but a minute or thereabouts, after making these observations, when he heard the bell ring to stop the engine, and upon coming out, saw the schooner standing west, across his bows. He has been twenty-five years engaged in navigating steamboats on the Chesapeake Bay, and he proved that the look-out and helmsman were both experienced, and well qualified for their respective offices, were both in their proper places, attending to their respective duties.

I have said nothing of the testimony of the master of the Keyser, which sailed from the Patuxent in company with the Perin. It is obvious, that he was at too great a distance to see, by moonlight, the exact course of the steamboat or the Perin, when they neared each other, or what passed just before, or at the moment of collision; for, he did not arrive at the place of the disaster, although he immediately made sail for it, until the steamboat had proceeded up the bay, and was out of hail, with a six or seven-mile fair wind; it must, therefore, have taken him nearly half an hour to reach the wreck; his distance must, consequently, have been between two and three miles, although he supposes it was shorter. These estimated dis-

tances, on water, especially at night, are seldom entirely accurate, and not to be relied on, unless made by a practised seaman or pilot, accustomed, necessarily, to measure the distance by his eyes.

Neither can the rate at which the steamboat was moving, be imputed to her as a fault. She was in a wide, open water, on a bright, moonlight night, in which a small sailing vessel could be seen at the distance of three or four miles, and if the sailing vessel did her duty by keeping steadily on her course, a steamer would have no difficulty in passing her at a safe distance, at the speed with which the Louisiana was then moving. But the circumstance stated in the answer, that she was carrying the mail, and bound by contract to perform the trip between Baltimore and Norfolk, within a certain time, has no influence on the decision of the court. A steamboat carrying the mail is bound by the same laws and rules of navigation that govern any other steamer, which is engaged in the transportation of passengers or merchandise, and without any mail; and no contract with the post-office department, or any other department of the government, can dispense, in any degree, with any of the duties to which other steamboats, navigating the same waters, are subject. The mail-carrier is bound to observe the same laws and regulations which govern steamboats engaged in the ordinary business of transporting passengers or merchandise. But, for the reasons before mentioned, I think the speed of the Louisiana was not an incautious or imprudent one at the time, and furnishes no ground for subjecting her to any portion of the damage.

I am sensible that the strictest supervision should always be exercised by courts of justice over steam-vessels navigating our bays and rivers, and the utmost vigilance and caution constantly exacted from them, when approaching sailing vessels; this has been the invariable rule and settled policy of the courts of the United States, in cases of collision. But it appears to me, upon a careful examination of the whole testimony, that the steamboat, in this instance, was in no respect culpable; and that the disaster was occasioned altogether by the incompetency and mismanagement of those who were in charge of the schooner; and in this view of the case, the damage must fall altogether upon those who confided their property to incompetent or negligent hands. If the steamboat committed no fault, she is not justly liable for any share of the damage. The decree of the district court must, therefore, be reversed, and the libel dismissed with costs to the respondents in this court, each party to pay his own costs in the district court.

[NOTE. This case was appealed to the supreme court by the libellants, and the decision of the circuit court was reversed in an opinion by Mr. Justice Grier. 23 How. (64 U. S.) 287. Chief Justice Taney dissented. The steamboat was condemned to pay the whole damage incurred by the collision. It was held, following Chamberlain v. Ward, 21 How. (62 U. S.) 570, that steamers must have constant and vigilant look-outs stationed in proper places on the vessel; these must be experienced persons, and occupy favorable positions, usually on the forward deck. The disregard by the defendants below of these fundamental rules of navigation on thoroughfares of commerce rendered them negligent and liable.]